**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 94-10045

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

OTHNIEL McKINNEY, SR., LONNIE CHARLES SMITH,
DONALD EARL WADE, BRENT LEDEAN ALLEN,
CAROLYN SUE WALKER, and ANTONIO TURNER,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Texas

(May 17, 1995)

Before WISDOM, WIENER, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellants Othniel McKinney, Sr. (McKinney), Lonnie Charles Smith (Smith), Donald Earl Wade (Wade), Brent Ledean Allen (Allen), Carolyn Sue Walker (Walker), and Antonio Turner (Turner) appeal their criminal convictions and sentences. On July 28, 1993, a superseding indictment was returned against twelve named defendants charging that they, along with nine others who had been previously indicted, conspired to violate various drug laws. All of the conspirators entered guilty pleas, except the six Appellants who were tried together in a two and a half week trial. Although the

jury acquitted some of the Appellants on some counts, all six received convictions and sentences ranging from 235 months to life.[1]

## I. FACTS

This case involved two overlapping drug operations that sold cocaine and cocaine base (crack) in Wichita Falls, Texas between 1989 and May 1993. One was run by Appellant McKinney, the other by J. B. Butler (Butler), who pleaded guilty and did not appeal.

McKinney owned several businesses in Wichita Falls including a gameroom/food service called Kinney's Playhouse (the Playhouse) and a used car lot. Cherry Johnson (Johnson), who also pleaded guilty and did not appeal, managed the Playhouse premises, while McKinney came by only occasionally. In the summer of 1989, J. B. Butler moved to Wichita Falls. McKinney was characterized at trial as a major crack dealer in the area when Butler arrived in town. Butler began getting cocaine from Dallas/Fort Worth and reselling it in Wichita Falls. At first, Butler pooled his money with Smith to purchase crack to resell. Appellants Smith and Wade went to Dallas with Butler many times to pick up drugs, and Allen made one Dallas trip with Butler. Butler later began getting cocaine from Florida. Allen, Smith and Wade each got their own supplies of crack on the Dallas trips, as well as selling "fronted" cocaine for Butler.

These three Appellants sold small amounts of drugs directly

---

[1] Appendix A details the charges, dispositions, and punishment imposed on each Appellant.

to users.  Johnson sold larger quantities of drugs for both Butler and McKinney out of the Playhouse.  McKinney did not know at first that Johnson was selling for Butler and when he found out sometime after November 1991, he complained to Butler that he had not known about it earlier.

Butler also sold crack to McKinney, and referred customers to McKinney when he was out of crack.  Once, Butler delivered McKinney's crack to Johnson at the Playhouse, and Johnson paid for it.  Three other times he delivered McKinney's drugs to McKinney at Appellant Walker's house.  Walker, who was McKinney's girlfriend, was present at two of these transactions and paid Butler for the drugs.

Odessa Harper (Harper), who pleaded guilty and testified against the Appellants, also sold crack for McKinney.  Harper testified that she picked up about $700.00 worth of crack from Walker five times a month.  Harper also observed wet, unpackaged crack at Walker's home in a Pyrex bowl.

The trial testimony established that others who were involved in selling cocaine in Wichita Falls got most of their crack through Butler or McKinney.

Appellant Turner traveled from his home in Kansas to Wichita Falls to buy cocaine from Butler four times in April and May of 1993, who testified that he met Turner in April 1993.  Ronald McDonald (McDonald), a co-conspirator involved with Butler, was present at one buy.  Amelia Dickerson accompanied Turner to two of the other buys, actually paying Butler for Turner's drug purchases.

3

Dickerson had gotten drugs from Butler previously and sold them in Kansas and introduced Butler to Turner.

## II. THE VENIRE PANEL

a. Proceedings below and standard of review

Each of the Appellants challenge the method used by the district court for selecting the venire panel, alleging that it violated the Jury Selection and Service Act, 28 U.S.C. §§ 1861-1878, and their constitutional rights protected by the Sixth and Fourteenth Amendments to the United States Constitution.

All of the defendants are African-American. The 73 person venire panel included no African-Americans. On October 12, 1993, after Appellants viewed the assembled jury panel, but before they began *voir dire* of the venire, Walker moved to stay the trial until another venire could be drawn for selection of the jury, and her motion was adopted by her co-defendants. The potential that no African-Americans would be on the venire panel was discussed at the pretrial hearing on September 29, 1993, where the district court advised Appellants to prepare a written motion for filing if it became appropriate. Notwithstanding Appellants' failure to present a sworn motion or an affidavit in support of the motion in compliance with 28 U.S.C. § 1867(d), the district court granted Appellants a hearing "in the interest of justice." The jury clerk was made available to Appellants during a break and testified at the hearing later the same day.

Up until August 1993, the district court drew its venire panels from the voter registration lists in the counties within the

4

Amarillo Division.  Effective August 27, 1993, the plan was changed to allow for inclusion in jury wheels the names of those persons who, since 1990, have obtained or renewed a Texas drivers license or a Texas Department of Public Safety personal identification card, in addition to voter lists.  This case was the first case tried in the Amarillo Division under the new jury plan.

The plan requires that a computer randomly select a certain number of names, weighted by county population, to whom questionnaires will be sent.  When questionnaires are filled out and returned, court clerks decide which people are statutorily unqualified or are entitled to some legal exemption from jury service.  The questionnaires ask the respondents to identify their race.  If that answer is filled out by the respondent, which is not always the case, the court clerk will know the race of the respondent.  However, race is not a factor used in the weeding out process.  The resulting group of qualified people is the source from which venire members are summoned.  The district court tells the clerk how many people to summon, which is done by random selection, choosing for example, every seventeenth name until the required number is reached.

For the venire at issue, about six thousand questionnaires were sent out.  After exclusions of those who were not qualified, those who were exempt, and those who did not return the questionnaire[2], there were about 2,700 names in the qualified jury

---

[2] There was no breakdown among these three categories in the record.  The percentage of people failing to respond to the questionnaire was not established.

wheel. Out of that list, 150 people were selected at random and summoned for this venire panel.

Appellants made the following factual allegations in support of their challenge to the venire panel: First, African-Americans comprise about 2.28% of the population in the Amarillo Division of the Northern District of Texas. Second, there is a higher concentration of African-Americans in Potter and Randall Counties than in the other counties in the Northern District of Texas. Even though 60% of the population base for the division resides in Potter and Randall Counties, less than 50% of this venire came from those counties, decreasing the chances of proportional representation for African-Americans. Third, the crimes charged occurred in a different division of the district with a higher percentage of African-American population. By denying Appellants' motion to change venue, the district court diminished the chances of African-Americans serving on the jury. Fourth, the clerk's office had the opportunity to discriminate because the juror information questionnaire gave the jurors' race, and there was no protection against a clerk failing to include respondents in the qualified pool on the basis of race, although the clerk denied under oath that that happened.

The district court concluded that the evidence adduced at the hearing showed that there was no systematic exclusion of minority members from the venire, and denied Appellants' motion to stay. We review this factual determination for clear error.

b. The Jury Selection and Service Act

6

The Jury Selection and Service Act, 28 U.S.C. §§ 1861-1878 (the Act) was enacted to provide a statutory remedy to realize the policy that all litigants in Federal Courts entitled to trial by jury have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. 28 U.S.C. § 1861. No citizen can be excluded from federal jury service on the basis of race, color, religion, sex, national origin, or economic status. 28 U.S.C. § 1862. Each United States district court is required to devise and put into operation a plan for achieving these objectives, while complying with the strict parameters set out in the Act. 28 U.S.C. § 1863 A defendant must allege and prove a substantial failure to comply with the provisions of the Act to gain relief. 28 U.S.C. § 1867(a).

The Appellants tacitly acknowledge that the Northern District of Texas has such a plan in place. However, they have identified three areas in which they claim that the Act affords them relief. First, they allege that the plan provided no protection against the possibility that a clerk's office employee could weed out prospective jurors on the basis of race. Second, a low response rate to the original questionnaires resulted in a self-selected non-random venire. They argue that the Act should be read to compel the clerk's office to pursue the non-responders to preserve the randomness of the original group of 6000. Third, where African-Americans make up 2.28% of the potential jurors, and no African-Americans are on a 73 person venire panel, a *prima facie*

violation of the Act has been established and if the Government fails to rebut that presumption, they are entitled to relief under the Act.

We need not reach the merits of the legal theories under-pinning the first two arguments, because the record does not support the factual allegations made by the Appellants. The only evidence offered on the elicit-weeding-out theory was sworn testimony that no such weeding out occurred. Second, there was no evidence at all of a low response rate. Finally, if we accept that African-Americans made up 2.28% of the community, a 73 person panel which included 1.66 African-American individuals would have been perfectly representative. In a truly random system, African-Americans will be over-represented in some 73 person panels (which include two or more) and under-represented in others (which include one or none). Under the circumstances of this case, the evidence that no African-Americans were on the panel does not establish a *prima facie* case of substantial failure to comply with the provisions of the Act.

b. Sixth Amendment

Appellants claim that their right under the Sixth Amendment to a jury drawn from a fair cross-section of the community was violated. In order to establish a *prima facie* violation of the fair cross-section requirement, Appellants must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in the venire panel is not reasonable in relation to the number of such persons in the

community; (3) that this under-representation is due to systematic exclusion in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

The district court noted, and Appellee does not contest, that African-Americans are a distinctive group within the Amarillo Division of the Northern District of Texas. However, the record supports the district court's finding that there was no systematic exclusion of African Americans in the jury selection process. We therefore conclude that Appellants failed to make out a *prima facie* claim under the Sixth Amendment.

c. Equal Protection

Appellants claim that they made out a *prima facie* case of equal protection violation by establishing that there was an under-representation of African-Americans on the venire and that the opportunity for discrimination existed in the operation of the jury selection system, citing *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

In *Alexander*, "Negroes" constituted 21% of the population presumptively eligible for grand jury service, but the grand jury selected included no "Negroes." Although there was no evidence that the commissioners consciously selected by race, the racial designation on the jury questionnaires and information cards provided the opportunity for racial discrimination. This opportunity, in combination with the substantial disparity between the proportion of African-Americans chosen and the proportion in the eligible population, established a *prima facie* case of

9

discrimination.

We hold that Appellants have not made out a *prima facie* case of equal protection violation. The disparity between 2.28% eligible African-American population, and no African Americans on the venire panel does not raise the inference that racial discrimination rather than chance produced the result. *See Alexander*, 405 U.S. at 630, 92 S.Ct. at 1225. The opportunity for racial discrimination, without more, is not enough to shift the burden of proof to the Government on an equal protection claim.

We therefore affirm the district court's denial of Appellants' motion to stay.

### III. SUFFICIENCY OF THE EVIDENCE

a. Standard of review

Appellants Turner, Smith, Allen and McKinney challenge their conspiracy convictions claiming that the evidence was insufficient to support the convictions. These convictions must be affirmed if a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). In a conspiracy prosecution pursuant to 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate a federal drug statute, and that (2) each conspirator knew of the conspiracy, (3) intended to join it, and (4) did participate in the conspiracy. *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir. 1993), *cert. denied*, ___U.S.___ 114 S.Ct. 1096 (1994).

10

The government must prove more than knowledge of a conspiracy or association with conspirators. *United States v. Grassi*, 616 F.2d 1295, 1301 (5th Cir.), *cert. denied,* 449 U.S. 956 (1980). Knowledge and association, however, may be combined with other circumstantial evidence to prove an agreement to join a conspiracy. *Id.* at 1301-1302.

b. Turner

Turner has not challenged his conviction for possession of cocaine with intent to distribute. Rather, he contends that although he bought drugs from Butler, he had no other connection to the Butler/McKinney conspiracies. Proof of a buyer-seller agreement, without more, is not sufficient to tie a buyer to a conspiracy. *United States v. Thomas*, 12 F.3d 1350, 1365 (5th Cir.), *cert. denied*, 114 S.Ct. 2119 (1994).

The evidence established that Turner lived in a different state, did not buy cocaine from the conspirators on credit, or introduce others into the conspiracy. Turner made four purchases, ranging from 18 ounces to a half-kilogram of crack cocaine, over a six week period. While McDonald was present at one of the buys, at the behest on Butler, the record does not support the inference that Turner knew McDonald. On the other hand, Dickerson was present at two of the buys, went in with Turner on the purchases and paid for them.

Viewed in the light most favorable to the verdict, the evidence supports the conclusion that Dickerson served as the Kansas connection for Butler's drug distribution organization and

11

that Dickerson recruited Turner by enlisting him into the enterprise in order to expand the Kansas marketing scheme. As Turner's involvment increased, he accompanied Dickerson to Wichita Falls, met Butler, and began to purchase cocaine directly from Butler for resale in Kansas.

This evidence persuades us that a jury could reasonably conclude that Turner's role was more than a mere purchaser and that he joined the conspiracy as part of its marketing organization.

c. Smith and Allen

Smith and Allen take the position that they did not know the total reach of the conspiracy. A defendant need only have had a minor role in the conspiracy, once it is shown that he voluntarily agreed to participate. *United States v. Gonzales*, 866 F.2d 781, 788 (5th Cir.), *cert. denied*, 490 U.S. 1093 (1989). Although they were smaller players, the record supports their conspiracy convictions.

d. McKinney

The Government alleged two overlapping conspiracies, one headed by McKinney and one by Butler. The question presented by McKinney is whether there was a variance between the indictment and the proof. A conviction will not be reversed for such a variance unless,

> (1) the defendant establishes that the evidence the government offered at trial varied from what the government alleged in the indictment, and (2) the variance prejudiced the defendant's substantial rights.

*United States v. Puig-Infante*, 19 F.3d 929, 935-36 (5th Cir.), *cert. denied*, 115 S.Ct. 180 (1994). To determine if there was a

12

variance, the court considers (1) whether there was a common goal, (2) the nature of the scheme, (3) whether the participants in the various dealing overlap. *Id.*, at 936. In analyzing the nature of the scheme, we ask whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, whether there are several parts inherent in a larger common plan, or whether the nature of the activity is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants. *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982).

McKinney contends that the evidence proved he headed a separate conspiracy and that isolated drug buys from Butler were not sufficient to prove his agreement to join Butler's conspiracy. We reject this claim. The record affords sufficient evidence for a rational fact finder to conclude that there was a common goal -- the distribution of crack, extensive overlap of participants, and that McKinney's purchases from Butler and their mutual referrals contributed to the success of the overall venture.

### IV. INTRA-DISTRICT CHANGE OF VENUE

The district court denied motions by Smith and McKinney for intra-district change of venue from the Amarillo Division to the Wichita Falls Division, finding that the prompt administration of justice outweighed the relative inconvenience of an Amarillo trial. We review this decision for abuse of discretion. *United States v.*

13

*Dickie*, 775 F.2d 607, 609 (5th Cir. 1985), *abrogated in part on other grounds*, 37 F.3d 160 (5th Cir. 1994).

The Sixth Amendment requires that a criminal trial be held in the district in which the alleged crime occurred. *United States v. Duncan*, 919 F.2d 981, 985 (5th Cir. 1990), *cert. denied*, 500 U.S. 926 (1991). There is no constitutional right to be tried in a particular division within a district. *United States v. Anderson*, 328 U.S. 699, 704-705, 66 S.Ct. 1213, 1216-1217, 90 L.Ed. 1529 (1946); *Duncan*, 919 F.2d at 985. Rule 18 of the Federal Rules of Criminal Procedure provides that "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The Court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice."

Appellants contended that because most of the defendants and witnesses lived in Wichita Falls, and because most of the acts alleged in the indictment occurred there, the case should be tried there. They also alleged that the convenience of the defendants and the witnesses, and the prompt administration of justice would be best served by transferring the trial to the Wichita Falls Division. In their briefs, they also allege that the Wichita Falls Division has more African-American residents than does the Amarillo Division, although that was not urged as a reason for the transfer in the original motions.

The court considered the availability of suitable facilities

14

for trial, the lack of availability of jail space in Wichita Falls to hold the four incarcerated defendants, and the incarcerated trial witnesses, the fact that six of the remaining defendants were represented by Amarillo attorneys, while one attorney was from Wichita Falls, and one from Oklahoma City, Oklahoma, the relative accessibility to the place of trial for all persons involved, and the expense of transporting witnesses and the availability of witnesses at potential places of trial, as well as the effect on the court's docket of the requested transfer. The district court considered the appropriate factors and the denial of the motion to transfer was not an abuse of discretion.

An attempt to influence the racial balance of the jury by setting a case in a particular division would not have been appropriate or acceptable, and we note that there is no indication that the district court considered the racial composition of the various divisions in reaching her conclusion.

## V. MOTION TO SEVER

The district court denied Smith's pretrial motion to sever. Smith contends that this was error because he was denied exculpatory testimony from co-defendant Allen, and thereby prejudiced. We review the decision to deny the motion to sever for abuse of discretion. *United States v. Stotts*, 792 F.2d 1318, 1321 (5th Cir. 1986).

Smith contends that his case should have been severed so that Allen could testify that it was not Smith's voice on one of two taped conversations attributed to him by Butler. The basis of his

15

written motion in the district court was his concern that he would suffer prejudice as a result of spill-over from the guilt of his more culpable co-defendants.  The need for Allen's testimony was brought up during the hearing on the motion, but there is no testimony or affidavit from Allen in the record that he could or would have provided the testimony Smith describes.

Rule 8(b) of the Federal Rules of Criminal Procedure provides that two or more defendants may be charged in the same indictment if they are alleged to have participated in the same series of acts or transactions constituting an offense.  As a rule, parties jointly indicted should be tried together, especially in conspiracy cases.  *See United States v. Rocha*, 916 F.2d 219, 227-228 (5th Cir. 1990), *cert. denied*, 500 U.S. 934 (1991).  Rule 14 provides the exception to Rule 8(b): "If it appears that a defendant...is prejudiced by a joinder of...defendants...for trial together, the court <u>may</u>...grant a severance of defendants or provide whatever relief justice requires."  FED.R.CRIM.P. 14.

To obtain a severance based on his desire to call a co-defendant as a witness on his behalf, the defendant must prove a bona fide need for the testimony, the substance of the desired testimony, the exculpatory effect of the desired testimony, and that the co-defendant would indeed have testified at a separate trial.  *United States v. Kane*, 887 F.2d 568, 573 (5th Cir. 1989), *cert. denied* 493 U.S. 1090 (1990).  Smith did not sustain his burden under *Kane*, particularly with respect to the availability and willingness of Allen to testify at a separate trial and thus

16

the district court did not abuse it's discretion in denying the motion to sever on this ground.

As for Smith's claims of prejudicial spillover because of the disparity of evidence against the defendants, limiting instructions can generally cure any prejudice caused by joint trials. *See United States v. Castro*, 15 F.3d 417, 422 (5th Cir.), *cert. denied*, 115 S.Ct. 127 (1994). Smith makes no complaint that the district court failed to give adequate limiting instructions. Furthermore, the fact that the jury acquitted some defendants on some counts supports the conclusion that the jury sorted through the evidence and considered each count separately. *United States v. Lindell*, 881 F.2d 1313, 1319 (5th Cir. 1989), *cert. denied*, 496 U.S. 926 (1990). We therefore conclude that the district court did not abuse its discretion in denying Smith's motion to sever.

## VI. BILL OF PARTICULARS

McKinney moved for a bill of particulars to "identify his place in the tangle of defendants so that he could avoid surprise at trial and assist his lawyer in preparing his defense." The magistrate judge denied the motion, reasoning that:

> in view of the discovery ordered, the particularity of the indictment, and the government's representations to the Court that it will aid defendant in locating relevant material within the discovery being made available to defendant, and in view of the government's further representations to the Court that on all indicted substantive counts it will disclose the dates and times of such substantive offenses and where they took place, at least as closely as witnesses will testify, and will also provide such information as to unindicted acts which involve specific acts of possession and/or distributions of controlled substances.

The denial of a motion for a bill of particulars is reviewable

17

on appeal from a judgment of conviction, but the judgment will be reversed only if the ruling was a clear abuse of discretion. *United States v. Vasquez*, 867 F.2d 872, 874 (5th Cir. 1989). McKinney alleges that he did not receive certain evidence prior to trial, particularly "the testimony of Mayberry about an alleged transaction in 1993, and...the testimony of Odessa Harper[.]" However, McKinney does not allege, let alone establish, surprise and prejudice, without which his claim fails. *See United States v. Lindell*, 881 F.2d 1313, 1326 (5th Cir. 1989), *cert. denied*, 496 U.S. 926 (1990).

## VII. SUSPENSION OF COUNSEL FROM PRACTICE OF LAW

Wade's trial lawyer informed the district court on October 18, 1993, the fifth day of trial, that he had learned that morning of his suspension by the State Bar of Texas from the practice of law in Texas on September 20, 1993 due to his failure to complete the mandatory continuing legal education (MCLE) requirement. The district court communicated with the Texas Supreme Court, which agreed to hold the suspension in abeyance pending the conclusion of the trial. Wade, joined by Smith and McKinney, moved for mistrial, which the district court denied. We review the order denying a motion for mistrial for abuse of discretion. *United States v. Willis*, 6 F.3d 257, 263 (5th Cir. 1993).

The suspension of an attorney by the state in which he is authorized to practice law does not automatically result in his suspension from practice in the federal courts, even when the state bar membership was the predicate upon which the attorney was

18

admitted to the federal court. *United States v. Carpenter*, 776 F.2d 1291, 1297 (5th Cir. 1985), *citing Theard v. United States*, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957). The local rules for the courts of the Northern District of Texas provide that in a case where a lawyer loses the right to practice in his home state because of failure to meet CLE requirements, any suspension in federal court is not automatic. LOCAL RULE 13.2, U. S. DIST. COURT, NORTHERN DIST. OF TEXAS. Wade's attorney was never suspended from practicing before the district court in this trial. It was therefore not an abuse of discretion to deny the motion for mistrial.

Wade goes on to raise an ineffective assistance of counsel claim. A claim of ineffective assistance of counsel generally cannot be addressed on direct appeal unless the claim has been presented to the district court; otherwise there is no opportunity for the development of an adequate record on the merits of the allegation. *United States v. Navejar*, 963 F.2d 732, 735 (5th Cir. 1992). The issues Wade raises here were not raised before the district court in the context of an ineffective assistance of counsel claim and are not sufficiently developed for review by this Court.

Wade argues that where defendant's attorney was not duly licensed to practice law because of a failure to meet the substantive requirements for the practice of law, there is a per se violation of the Sixth Amendment right to effective assistance of counsel, relying on *Bellamy v. Cogdell*, 974 F.2d 302 (2nd Cir.

19

1992), *cert. denied*, 113 S.Ct. 1383 (1993).  In certain Sixth Amendment contexts involving the "[a]ctual or constructive denial of the assistance of counsel," prejudice is presumed.  *Strickland v. Washington*, 466 U.S. 668, at 692, 104 S.Ct. 2052, at 2067, 80 L.Ed.2d 674 (1984).  The Second Circuit has fashioned a "per se rule" by which it will find a per se violation of the Sixth Amendment where, unknown to the defendant, his counsel was, at the time of trial not licensed to practice law because of a "failure ever to meet the substantive requirements for the practice of law," or (2) was implicated in the defendant's crimes.  *Bellamy*, 974 F.2d at 306.  Bellamy's lawyer was disbarred by the state licensing committee after the trial in question was over and his suspension was prospective, so the Second Circuit determined that there was no per se violation.  It is also important to note that he represented Bellamy in a state criminal proceeding, not a federal proceeding.  *Id.*, 974 F.2d at 307.  We need not decide whether, in the circumstances described by the *Bellamy* court, we would find per se ineffective assistance of counsel.  Ward's attorney was adequately credentialed at all times relevant to this case to practice law in the Federal District Court for the Northern District of Texas, and we find no Sixth Amendment violation in the record before us.

### DOUBLE JEOPARDY

Allen was convicted by the State of Texas on a plea of guilty for violating an organized crime statute.  He was subsequently convicted in federal court based on the same conduct.  There is no double jeopardy prohibition against an individual being prosecuted

20

by dual sovereigns for the an act that violates the laws of both sovereigns. *United States v. Moore*, 958 F.2d 646, 650 (5th Cir. 1992), *cert. denied*, 114 S.Ct. 647 (1993).

The Supreme Court has suggested that an exception to the dual sovereign doctrine exists when prosecution by one sovereign is used as a tool for successive prosecution by another sovereign. *Bartkus v. Illinois*, 359 U.S. 121, 123-124, 79 S.Ct. 676, 677-678, 3 L.Ed.2d 684 (1959). When a defendant claims collusion between federal and state law enforcement officials, the defendant has the burden of producing evidence to show a *prima facie* double jeopardy claim. Once a *prima facie* case is shown, the burden of persuasion shifts to the government. *United States v. Cooper*, 949 F.2d 737, 750-751 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 2945 (1992).

Allen alleged that investigating officers failed to report some of Allen's alleged crimes to state prosecuting officers in time to incorporate them into the state plea bargaining process, but later reported them to federal officials, in an effort to "resurrect" them, thus unconstitutionally manipulating the system. After hearing the testimony of the federal prosecutor detailing the decision making process which preceded the federal indictment and denying these allegations, the district court determined that Allen had not established a prima facie case of collusion between the federal and state government implicating double jeopardy concerns. The district court's finding is a factual determination which we review for clear error. *United States v. Weeks*, 870 F.2d 267, 269 (5th Cir.), *cert. denied* 493 U.S. 827 (1989). We find that the

21

district court's determination was not clearly erroneous.

### DELIBERATE IGNORANCE INSTRUCTION

Over McKinney's objection, the district court charged the jury that "knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact." McKinney contends that the evidence showed that either he knew or he had no knowledge at all of the drug activities at the Playhouse, but there was no evidence of deliberate ignorance that would have supported the deliberate ignorance instruction.

The government argues that testimony that McKinney did not visit the Playhouse very often, although he was the owner and lived and worked in the same city, raised the inference of deliberate ignorance, so that the instruction was properly given. The government argues, in the alternative, that evidence of his knowledge of the drug activities at the Playhouse was overwhelming, making any error in the instruction harmless. *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993), *cert. denied*, 115 S.Ct. 671 (1994) (Error in giving the deliberate ignorance instruction is harmless where there is substantial evidence of actual knowledge.)

We review challenges to jury instructions by determining "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir. 1990). A district court has broad discretion in framing the instructions

22

to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law. *United States v. Arditti*, 955 F.2d 331, 339 (5th Cir.), *cert. denied*, 113 S.Ct. 597 (1992).

"The purpose of the deliberate ignorance instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). It should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference. *United States v. Wisenbaker*, 14 F.3d 1022, 1027 (5th Cir. 1994). McKinney claimed during opening statements lack of guilty knowledge, and the proof at trial that he failed to visit his own local business except occasionally properly supported the district court's deliberate indifference charge.

SENTENCING ISSUES

"A sentence imposed under the Federal Sentencing Guidelines will be upheld unless a defendant can demonstrate that it was imposed in violation of the law, was imposed because of an incorrect application of the guidelines, or was outside the range of applicable guidelines, and is unreasonable." *United States v. Castaneda-Cantu*, 20 F.3d 1325, 1335 (5th Cir. 1994). This Court reviews the application of the sentencing guidelines *de novo* and the district court's findings of fact for clear error. *United States v. Hill*, 42 F.3d 914 (5th Cir. 1995). In making fact findings pursuant to the sentencing guidelines, a district court

23

need only be convinced by a preponderance of the evidence.  *United States v. Casto*, 889 F.2d 562, 570 (5th Cir. 1989), *cert. denied*, 493 U.S. 1092 (1990).

a. Walker

Walker raises four points of error with regard to her sentence.  First, Walker contends that the district court erred when it found that more than five kilograms of cocaine base were attributable to her.  Walker's contention is based on attacks on the credibility of witnesses who testified about the amount of cocaine she sold or participated in selling.  The district court's findings are not clearly erroneous.  The evidence at trial established that approximately 54.4 grams of crack cocaine were seized from Walker's home in two separate searches.  Johnson testified that she picked up various amounts totaling at least eight kilograms of crack from Walker's home, and Harper testified that she picked up 12-50 ounces from Walker.  Butler testified that Walker was present for and counted out the payment for two transactions involving at least 5 ounces of crack which Butler sold to McKinney.  Their combined testimony supports the district court's attributing to Walker responsibility for in excess of five kilograms of crack cocaine.

Second, Walker complains that the court failed to make specific findings of fact regarding the amount of crack which she should have known or foreseen would be involved in the conspiracy.  *See United States v. Quiroz-Hernandez*, 48 F.3d 858 (5th Cir. 1995).  Because she was sentenced based on personal involvement only, there

24

was no need for the district court to make a "should have known or foreseen" finding.

Third, Walker argues that the district court refused to depart downward based on the erroneous understanding that the guidelines do not permit downward departure on the basis of her health problems and family responsibility. She relies on the comments made by the district court during the sentencing hearing:

> Now your lawyer has said that the penalty is excessive. I can say to you the Court probably would not in the absence of guidelines have set this penalty. The Court agrees that the penalties, particularly with regard to cocaine base are greater than I would have set, and in my opinion are greater than should be imposed, these are simply the penalties that have been imposed by Congress and by the United States Sentencing Commission under the authority of Congress, and the Court has no discretion in it except to give you the bottom of the guidelines, and I have done that.

These comments indicate that the district court believed that the penalty for cocaine base is too harsh, but does not support the contention that the district court believed downward departure for health and family reasons was warranted but precluded by the guidelines. Further, the specifics of her claim (52 years of age, heart problems, high blood pressure and responsibility for her elderly mother) do not warrant downward departure. *See United States v. Guajardo*, 950 F.2d 203, 208 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 1773 (1992); U.S.S.G. §§ 5H1.1, 5H1.4, 5H1.6.

Fourth, Walker contends that the district court erred in failing to make a downward adjustment for her role in the offense. She points out that three other conspirators, McKinney, Butler and Johnson played a larger role in the conspiracy than she did, and

25

claims that she should be considered a "minor participant" by comparison. Minor participant means one who is less culpable than most other participants. U.S.S.G. § 3B1.2(b), comment n. 3. The district court found that she did not prove minor participant status by a preponderance of the evidence. This factual determination was not clearly erroneous, given the number of street dealers involved in the conspiracy who handled smaller quantities of drugs and were less involved than Walker.

b. Smith and Allen: Disproportionality

This case presents the now all too familiar situation where some of the leaders pleaded guilty, testified against less culpable participants in the conspiracies, and received shorter sentences than some of those defendants. Smith and Allen complain that their comparatively harsher sentences amount to retaliation for the exercise of their constitutional right to stand trial and a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Their arguments are predicated on pre-guideline cases that do not inform our decision in this instance. *See, e.g., United States v. Deaton*, 477 F.2d 65 (5th Cir. 1973) *cert. denied*, 414 U.S. 840 (1973), and *Rodriquez v. United States*, 394 F.2d 825 (5th Cir. 1968).

Smith and Allen both received sentences within the guideline range, and they do not argue that the guidelines were incorrectly applied. It is well settled that an appellant cannot challenge his sentence based solely on the lesser sentence given to his co-defendants. *United States v. Pierce*, 893 F.2d 669, 678 (5th Cir.

1990) *cert. denied*, 113 S.Ct. 621 (1992). This disproportionality argument is without merit.

c. Turner and Smith: Guideline Treatment of Crack Cocaine

Turner and Smith contend that the sentencing guidelines relating to crack violate their equal protection rights because statistics indicate African-American are convicted more often of drug crimes involving crack, while Caucasians statistically prefer powder cocaine, which exposes them to less serious punishment. *United States v. Fischer*, 22 F.3d 574, 579-580 (5th Cir.), *cert. denied*, 115 S.Ct. 529 (1994), rejected an equal protection claim with respect to the different treatment accorded cocaine powder and cocaine base under the sentencing guidelines. Turner relies on a vote by the House of Representatives in March 1994 to ask the Sentencing Commission to propose a way to equalize the penalties for cocaine powder and cocaine base as a basis for overruling the previous decision by this Court rejecting his argument. *Fischer* was decided in May 1994, after the House vote, thus foreclosing Turner's argument.

d. Amount of Cocaine Attributed to Allen

The district court found that Allen knew or should have reasonably anticipated that the conspiracy in which he was involved would traffic in excess of 5 kilograms of crack cocaine. Allen challenges this factual finding.

A defendant convicted of a drug trafficking offense is sentenced based on both the drugs with which he was directly involved and the drugs that can be attributed to him in a

conspiracy as part of his "relevant conduct." U.S.S.G. § 2D1.1(a)(3); *United States v. Carreon*, 11 F.3d 1225, 1230 (5th Cir. 1994). Relevant conduct for conspiratorial activity is defined in § 1B1.3(a)(1)(B) as "all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity"; it must be both reasonably foreseeable to the defendant and within the scope of the defendant's conspiratorial agreement to be counted against him. *Carreon*, 11 F.3d at 1230.

The evidence at trial established that Allen, in addition to selling drugs he obtained through other sources, sold crack fronted by Butler -- either directly or through McDonald -- for approximately four years. The Presentence Investigation Report (PSI) and the trial testimony supported a finding that Allen personally distributed well over five kilograms of crack. The district court's finding attributing over five kilograms of crack to Allen was not clearly erroneous.

e. McKinney's Role as Manager

McKinney contends that the district court erred when it added four levels to his base offense level predicated on his leadership role pursuant to U.S.S.G. § 3B1.1(a). He argues that the jury's verdict acquitting him of the charge of continuing criminal enterprise foreclosed the role adjustment.

At sentencing, McKinney objected to the role adjustment because of an alleged insufficiency of the evidence. McKinney did not object on the basis he now raises to this Court; therefore, we review for plain error. *United States v. Cabral-Castillo*, 35 F.3d

28

182, 188-189 (5th Cir. 1994) FED. R. CRIM. P. 52(b).  This Court has held that because the Government need only establish facts for use in sentencing by a mere preponderance of the evidence, a sentencing court may rely on facts underlying an acquitted count if the preponderance standard is satisfied.  *United States v. Carreon*, 11 F.3d 1225, 1241 (5th Cir. 1994).

The record supports a finding that Walker, Johnson, Harper, Harper's husband Cedric Freney, and Wade all worked for McKinney distributing crack cocaine.  With McKinney as the fifth participant, the evidence was sufficient to support the district court's finding or organizer or leader status.  U.S.S.G. §3B1.1(a). We find no plain error.

## CONCLUSION

For the foregoing reasons, we AFFIRM Appellants' convictions and sentences.

| Name | | Charge | Count | Disposition | Punishment |
|------|---|--------|-------|-------------|------------|
| Allen | * | distributing cocaine base | – 5 | dismissed | 324 months, 5 years |
| | * | distributing cocaine base | – 8 | guilty | supervised release, |
| | * | attempt to possess cocaine base w/ intent to distribute | – 30 | not guilty | $200.00 special assessment |
| | * | use of telephone to facilitate drug offense | – 34 & 40 | guilty | |
| | * | conspiracy[3] | – 1 | guilty | |
| McKinney | * | continuing crim. enterprise | – 2 | not guilty | life, 5 years |
| | * | possessing cocaine base | – 13 | not guilty | supervised release, |
| | * | possessing cocaine base w/ intent to distribute | – 14 | not guilty | $50.00 special assessment |
| | * | possessing cocaine base w/ intent to distribute | – 16 | not guilty | |
| | * | possessing cocaine base w/ intent to distribute | – 18 | not guilty | |
| | * | conspiracy | – 1 | guilty | |
| Smith | * | distributing cocaine base | – 5 | dismissed | 235 months, 5 years |
| | * | distributing cocaine base | – 7 | dismissed | supervised release |
| | * | conspiracy | – 1 | guilty | $50. special assess |

---

[3] Count 1 of the indictment charged all appellants with conspiring with each other and with other persons known and unknown to the grand jury, to distribute and to possess with the intent to distribute more than five kilograms of cocaine and more than 50 grams of cocaine base, a violation of 21 U.S.C. § 841(a)(1).

| Name | | Charge | Count | Disposition | Punishment |
|---|---|---|---|---|---|
| Turner | * | possessing cocaine base w/ intent to distribute | – 20-22  – 27 | not guilty guilty | 295 months, 5 years supervised release $300. special assessment |
| | * | interstate travel to facilitate drug offense | – 32 | guilty | |
| | * | using firearm in relation to drug offense | – 33 | guilty | |
| | * | use of telephone to facilitate drug offense | – 35  38 & 41 | not guilty guilty | |
| | * | conspiracy | – 1 | guilty | |

| Name | | Charge | Count | Disposition | Punishment |
|---|---|---|---|---|---|
| Wade years | * | possessing cocaine base w/ intent to distribute | – 15 | not guilty | 360 months, 10 supervised release, $50.00 special assessment |
| | * | possessing cocaine base w/ intent to distribute | – 17 | dismissed | |
| | * | conspiracy | – 1 | guilty | |

| Name | | Charge | Count | Disposition | Punishment |
|---|---|---|---|---|---|
| Walker | * | possessing cocaine base w/ intent to distribute | – 16 | not guilty | 292 months, 5 years supervised release $50.00 special assessment |
| | * | conspiracy | – 1 | guilty | |