United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 18, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-10515

UNITED STATES OF AMERICA,

                                    Plaintiff-Appellee,

                    versus

ELDON FLYN SIMMONS,

                                    Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

PER CURIAM:

    Eldon Simmons appeals his conviction of conspiracy to fix prices in violation of Section One of the Sherman Act.[1] He contends that the court erred by (1) denying his motion to sever, (2) inadequately instructing the jury, and (3) admitting out-of-court statements made by him and three government witnesses. We affirm.

                                    I

    Auto Glass Center operated automotive glass stores throughout Texas, and was originally owned by six shareholders, Richard Akin,

---

[1] 15 U.S.C. § 1.

Larry Vance, Jim Lupton, David Lupton, Eldon Flyn Simmons, and James Kuhn. Simmons oversaw all the Auto Glass Center stores and also ran American Glass Distributors, a wholesale auto glass distributor owned by the Jack Riedinger family. Auto Glass Center bought its glass exclusively from American Glass because Simmons controlled Auto Glass Center.

By the end of 1997, Auto Glass Center had 12 stores in central North Texas, all supervised by Vance, who reported to Simmons. At that time, the auto glass market was "very cutthroat," and Vance in particular was known for aggressively cutting prices to take business away from competitors. Auto Glass Center's primary competitor was A-1 Auto Glass, which was owned and operated by Roger McDonald.

Auto Glass Center also had one store in the Lubbock area, operating under the name Avenue H, whose manager was Angela Cuevas, Akin's sister. Like the North Texas area, the Lubbock market was "very competitive." Avenue H's primary competitor was Crafton's Glass, which was owned and operated by Dale Crafton.

At the end of 1997, Auto Glass Center experienced major changes: The Riedinger family bought the Luptons' shares and became one third owner of Auto Glass Center. Vance, the aggressive price cutter, was fired, to be replaced by James Lukacs and Kuhn.

On January 1, 1998, Akin became CEO of Auto Glass Center, a role in

2

which he "supervised the supervisors" but still reported to Simmons.

In early 1998, Simmons initiated a series of meetings with Auto Glass Center managers and McDonald of A-1. Simmons, Kuhn, Akin, Lukacs, and McDonald attended the first meeting, where they discussed "getting the price of glass up" and not competing for employees and clients. Lukacs and McDonald later exchanged pricing information, and, at a second meeting, Kuhn told McDonald that Auto Glass Center would not undercut A-1. Simmons made sure that Akin knew that this was the course of action he desired, and Kuhn and Lukacs went to various store managers to inform them of the new pricing arrangements. McDonald in turn sent a memorandum to all his employees detailing the agreement.

Lukacs and McDonald began checking with each other on specific accounts, asking each other to "correct" any undercut prices. At a third meeting, Maureen Edwards, an A-1 supervisor and McDonald's "right-hand person," discussed truck windshields, for which she produced a new price list. Kuhn and Lukacs enforced these truck windshield prices at Auto Glass Center stores.

In February, Crafton's Glass lost a large account to Avenue H after Cuevas quoted a significantly lower price. Cuevas contended that the issue was service, not price, and that Crafton was cheaper than Avenue H on many products. Akin supported his sister's argument, which angered both Simmons and American Glass salesman Joe LaRoe. On February 26, Simmons fired Akin after Akin refused to talk to Crafton about pricing. Cuevas taped conversations with

Simmons, Kuhn, LaRoe, and Crafton, who eventually agreed not to compete on prices and employees. (Akin had advised Cuevas to buy a tape recorder and take good notes.) Though she had exchanged price lists with Crafton, Cuevas was wary of implementing what she saw as an illegal price agreement and so, after failing to convince Simmons to abandon the plan, she resigned.[2]

On April 8, Auto Glass Center sales representative Amanda Brewer called on Freeman Pontiac Body Shop, which used Hudson's Auto Glass rather than Auto Glass Center, and pitched cheaper prices. The owner of Hudson's, Tim Hudson, got upset at Brewer for violating his deal with Kuhn and Simmons. Brewer told Hudson that she was only aware of the A-1 deal. After Hudson called Simmons, Simmons told Lukacs to correct the problem and control his workforce. Lukacs then told Hudson that Auto Glass Center would not compete on price.

In early May, Simmons, Kuhn, and Lukacs met for a final time with McDonald, who had called Simmons to discuss a breakdown in their pricing plan that was caused by State Farm Insurance's new price schedule. McDonald indicated that he "wanted out," but Simmons attempted to coax McDonald "not to be quite so hasty . . . things could still work out." They continued to abide by their

_____

[2] In January 2000, Akin and Cuevas, both of whom were government witnesses against Simmons, filed a wrongful termination suit against American Glass and Auto Glass Center's umbrella corporation, Windshield Sales and Services, Inc., settling for $258,330 each.

4

agreement. Shortly thereafter, on May 12, 1998, A-1 received a federal grand jury subpoena.

On November 14, 2001, a grand jury indicted Simmons and Kuhn on two counts of criminal antitrust violations pursuant to Section One of the Sherman Act, 15 U.S.C. § 1. Count One charged them with conspiring to fix the price of automotive windshield replacement in North Texas from January 1998 until at least May 1998; Count Two charged them with conspiring to fix prices in the same industry in Lubbock, Texas, from March 1998 until at least May 1998.

On December 16, 2002, a jury returned a verdict of not guilty as to Simmons on Count Two, but hung on the remaining counts, prompting the district court to declare a mistrial. On February 7, 2003, Simmons filed a motion to sever, asking to be tried separately. This motion was denied and Simmons was retried on Count One, while Kuhn was retried on both counts. During the second trial with the same presiding judge, Simmons renewed his motion for severance and obtained the court's permission for a continuing objection whenever a witness testified as to Simmons' involvement in the Lubbock conspiracy (Count Two). On February 21, a jury returned guilty verdicts on all remaining counts.[3]

On May 23, the court sentenced Simmons to ten months' imprisonment, a $75,000 fine, and one-year supervised release.

---

[3] During both trials, various employees of Auto Glass Center and A-1 testified as to having no knowledge of any price-fixing agreements. Only the testimony of Simmons and Kuhn, however, directly contradicted the facts as stated above.

5

That same day, Simmons filed a notice of appeal on three issues: (1) the denial of his motion to sever following the first trial; (2) the adequacy of the jury instruction at the second trial; and (3) the admission in the second trial of certain out-of-court recorded statements made by Simmons and three government witnesses.

## II

We turn first to Simmons' claim of error in the trial court's refusal to conduct separate trials. As a general rule, persons indicted together should be tried together, particularly when the offense is conspiracy.[4] In ruling on a motion to sever, a trial court must balance potential prejudice to the defendant against the "public interest in joint trials where the case against each defendant arises from the same general transaction."[5] To demonstrate reversible error, even where initial joinder was improper, a defendant must show "clear, specific and compelling prejudice that resulted in an unfair trial."[6] This prejudice must be of a type "against which the trial court was unable to afford

---

[4] *See, e.g., United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993).

[5] *United States v. Kane*, 887 F.2d 568, 571 (5th Cir. 1989).

[6] *United States v. Posada-Rios*, 158 F.3d 832, 863 (5th Cir. 1998) (quoting *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995)).

protection."[7]  We review the denial of a motion to sever for abuse of discretion.[8]

Simmons essentially argues that forcing him into a second trial with Kuhn allowed the government to try again his complicity in Count Two, the conspiracy of which he was acquitted in the first trial.  The argument continues that at the very least, the testimony of Akin, Cuevas, and Crafton tied Simmons to Kuhn's Count Two activities, a "spillover" of evidence that prejudiced the jury's consideration of Count One.  Relatedly, when confronted with the testimony of government witnesses as to the Lubbock conspiracy, trial counsel was "faced with a Hobson's choice," so as not to place emphasis on an aspect of the indictment for which Simmons was no longer at trial.

While we do not find this to be an easy question, we are ultimately persuaded that refusing to sever was not reversible error.  In our decision we are keenly aware that the claimed "efficiency" of a joint trial can be a surrogate for the reality that a joint trial of multiple defendants is simply to the advantage of the government.  It is the potential presence of

---

[7] *United States v. Mann*, 161 F.3d 840, 863 (5th Cir. 1998) (quoting *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir. 1989)).

[8] *United States v. Nutall*, 180 F.3d 182, 187 (5th Cir. 1999). *See also United States v. McGuire*, 608 F.2d 1028, 1031 (5th Cir. 1979) (noting that a court's balance of potential prejudice against the interest in judicial economy is "a consideration involving substantial discretion").

prosecutorial advantage distinct from the expense of duplicating efforts that draws our attention. Hence, when a joint trial puts evidence before the jury that would not be admitted against a defendant tried separately, we closely examine that evidence, its "spillover" potential, and whether a jury instruction to consider it only against the defendant against whom it was admitted can be truly effective.

Having cast a wary eye, we are persuaded that Simmons' argument must fail. First, the evidence was "not so complicated . . . as to prevent the jury from separating the evidence and properly applying it only to those against whom it was offered."[9] Evaluating the complexity of evidence is necessarily a fact-specific inquiry. Although both counts here involved fixing the price of auto glass, they involved different witnesses, locations, competitors, and time-frames. The district court did not abuse its discretion in determining that the jury could have easily distinguished between the two conspiracies.

Second, with the facts relatively easy to sort, the district court's jury instructions here provided adequate protection against prejudice. The court explained the differences between the counts, and used the instruction repeatedly approved by this Court as offering sound efforts to protect against prejudice in a joint

---

[9] *United States v. Manzella*, 782 F.2d 533, 540 (5th Cir. 1986).

8

trial.[10] These instructions were given to protect Simmons from the "spillover" evidence, to guard against the jury convicting Simmons on Count One based on evidence related to Count Two.[11] As for the clarity of their statement, Simmons did not challenge the instruction or request additions or modifications to it.

Third, Simmons simply did not suffer "clear, specific and compelling prejudice." As an initial matter, "the mere presence of a spillover effect does not ordinarily warrant severance."[12] Here, the direct evidence of Simmons' guilt on Count One, including the testimony by Akin, Lukacs, McDonald, and Brewer detailing the formation and implementation of the North Texas price-fixing

---

[10] Specifically, the district court instructed:

A separate crime is charged against one or more of the defendants in each count of the indictment. Each count, and the evidence pertaining to it, should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

*See, e.g., United States v. Bieganowski*, 313 F.3d 264, 288 (5th Cir. 2002); *Pofahl*, 990 F.2d at 1483; *Posada-Rios*, 158 F.3d at 863-64.

[11] *See Bieganowski*, 313 F.3d at 288 ("[B]ecause a jury is presumed to follow the court's instructions, instructions such as those given here are generally sufficient to cure the possibility of prejudice.").

[12] *Pofahl*, 990 F.2d at 1483. *See also Bieganowski*, 313 F.3d at 287 ("A spillover effect, by itself, is an insufficient predicate for a motion to sever.").

9

agreement, makes the spillover effect "especially negligible." Further, able counsel are not without tools to assist in the effort to cabin the bite of the spillover. Those skills were deployed here. Simmons' decision not to cross-examine the Lubbock-related witnesses – and not to ask for more specific limiting instructions – reflects counsel's judgment call that the testimony did not so inculpate Simmons that it was not manageable.

Although Simmons' contention is not without purchase, we ultimately conclude that Simmons fails to show sufficient prejudice from which the district court was unable to protect him; that denial of the motion to sever was not an abuse of discretion.

III

Simmons next urges that the district court failed to properly instruct the jury. A district court retains "broad discretion" in formulating jury instructions; we will not reverse "unless the instructions taken as a whole do not correctly reflect the issues and law."[13] While a defendant is entitled to an instruction on his theory of defense, he has no right to particular wording.[14] When considering an appeal for failure to give defendant's requested defense theory instruction, we review "whether the court's charge, as a whole, is a correct statement of the law and whether it

---

[13] *United States v. McKinney*, 53 F.3d 664, 676 (5th Cir. 1995).

[14] *United States v. Harrelson*, 705 F.2d 733, 736-37 (5th Cir. 1983).

10

clearly instructs jurors as to the principles of law applicable to the factual issues confronting them."[15]

Simmons argues that the district court at the second trial "gave substantially different instructions based on the same evidence than [it] gave at the first trial," and that the differences prevented the jury from adequately considering Simmons' defenses. The relevant portion of the jury charge at the second trial was a condensed version of that given at the first trial. This particular instruction explains how similar prices or pricing policies are not prima facie evidence of conspiracy or price-fixing arrangements.[16] Simmons objects to the exclusion of certain language stating, for example, that "[s]imilarity of competitive business practices . . . may be consistent with ordinary competitive behavior in a free and open market." In other words,

---

[15] *McKinney*, 53 F.3d at 676 (quoting *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir. 1990)).

[16] The instruction Simmons objects to reads as follows:

> The fact that competitors may have charged identical prices, copied each other's price lists, conformed exactly to another's price policies, discussed prices, obtained information about each other's prices, or exchanged information about prices does not establish a violation of the Sherman Act unless they did any of these things because of an agreement or arrangement or understanding such as is alleged in the indictment.
> Therefore, similarity or identity of prices charged does not alone establish the existence of a conspiracy. You may, however, consider these facts and circumstances along with other evidence in determining whether there was an agreement, arrangement, or understanding between such competitors as alleged in the indictment.

11

Simmons argues, the lack of explicit instructions that Simmons' behavior could be legal was serious error warranting reversal. The argument is without merit.

Simmons' defensive theory was that he and competitors in the North Texas market "did have similarity of competitive practices and had identical prices for the same goods and services, but *not* as a result of an unlawful agreement or understanding." And the instructions – the one cited by Simmons and others relating to, e.g., elements of the crime, scienter, agency, burdens of proof, and definitions – repeatedly emphasized that a price-fixing agreement, not any particular business practice, must be found in order to convict. The specific instruction cited by Simmons as being impermissibly modified from its equivalent at the first trial itself correctly and clearly presented the idea that parallel prices and practices *alone* do not establish a Sherman Act violation. In altering the instruction from that given in the first trial, the court simplified his earlier instruction.[17]

IV

Finally, Simmons urges that the district court abused its discretion in admitting out-of-court statements of Simmons and three government witnesses. We review a district court's

_____

[17] Nothing precludes a district court from modifying, condensing, or omitting parts of jury instructions after a mistrial for purposes of the retrial. *See, e.g., United States v. Williams*, 728 F.2d 1402, 1406 (11th Cir. 1984).

12

evidentiary rulings for abuse of discretion.[18]   "The abuse of discretion must create the likelihood of prejudice to the defendant and the substantial right at issue must be made known to the court."[19]  Non-constitutional trial error is harmless unless it had "substantial and injurious effect or influence in determining the jury's verdict."[20]

Simmons claims that out-of-court statements were improperly admitted as coconspirator statements under FED. R. EVID. 801(d)(2)(E).[21]  He also argues that these statements should have been excluded under FED. R. EVID. 403 because their probative value was far outweighed by their unfair prejudice.[22]  Specifically, he argues that the testimony of Akin, Cuevas, and Crafton (and the tape of a conversation between Cuevas and Simmons) relating to the Lubbock conspiracy, should have been excluded (or been accompanied by a limiting instruction) because Simmons had already been

---

[18] *United States v. Lowery*, 135 F.3d 957, 959 (5th Cir. 1998).

[19] *Id.*

[20] *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

[21] FED. R. EVID. 801(d)(2)(E) provides that a statement is not inadmissible hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

[22] FED. R. EVID. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

13

acquitted of participation in that conspiracy. Simmons asserts that, like the spillover effect he claims in his severance argument, the presentation of the Lubbock evidence – which was indisputably admissible with respect to Count Two against Kuhn – "deprived [Simmons] of having the jury give a clear and focused consideration of only the evidence relative to [his] activities [in the North Texas conspiracy]."

A coconspirator's statement should be admitted over objection only on a showing that: (1) there is a conspiracy; (2) the statement was made during the course and in furtherance of the conspiracy; and (3) the defendant and declarant were members of the conspiracy.[23] The government correctly contends that Simmons' prior acquittal was no bar to its evidence that Simmons participated in the Lubbock conspiracy for purposes of admitting coconspirator statements.[24] Further, the out-of-court statements Simmons questions were his own and were made while talking to the government witnesses. As a result, to the extent they are incriminatory, the statements are also admissible under Rule 801(d)(2)(A) ("the party's own statement") and the witnesses'

---

[23] *United States v. James*, 590 F.2d 575, 578 (5th Cir. 1979) (en banc).

[24] *See United States v. Brackett*, 113 F.3d 1396, 1400-01 (5th Cir. 1997). *See also United States v. Gonzalez*, 700 F.2d 196, 203 (5th Cir. 1983) (trial court in criminal conspiracy prosecution has discretion to determine application of *James* ruling as prerequisite to admitting coconspirator's statement); *United States v. Ricks*, 639 F.2d 1305, 1309-10 (5th Cir. 1981) (explaining the great flexibility a district court has in hearing evidence on preliminary facts for admission of coconspirator statement).

portions of the conversations are necessary context.[25]

Moreover, they are not clearly inculpatory, and it is also not clear that they were offered to prove the truth of the matter asserted, rather than as verbal acts or to show motive, state of mind, or bias.[26] What *is* clear is that the statements were all relevant to a proper understanding of Kuhn's role in the Lubbock conspiracy. Thus, their probative value was not "substantially outweighed by the danger of unfair prejudice."

In any event, other government witnesses and documentary evidence provided overwhelming direct and circumstantial evidence of Simmons' participation in, and leadership of, the North Texas conspiracy. This evidence, combined with adequate instructions that the jury was to treat the conspiracies and defendants separately, at worst leaves no reversible error.

V

For these reasons, we AFFIRM.

---

[25] *See Brackett*, 113 F.3d at 1400-01; *see also, e.g., United States v. Flores*, 63 F.3d 1342, 1358-59 (5th Cir. 1995).

[26] For example, Kuhn's counsel introduced the recording of the Simmons-Cuevas conversation to show that Cuevas had misunderstood Kuhn's instructions to her, while Akin's testimony went (at least in part) to explain the circumstances leading up to Akin's termination and refute implications of bias. Similarly, Crafton's testimony was introduced to show that Simmons had received a complaint from Crafton rather than to prove the truth of that complaint.

15