# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

―――――――――――――

## No. 98-20294

―――――――――――――

**Bobby Joe Burton,**

                        **Petitioner**

**v.**

**United States of America,**

                        **Respondent.**

―――――――――――――

## On Remand from the Supreme Court of the United States

―――――――――――――

December 22, 2000

Before Reynaldo G. Garza, Edith H. Jones and Emilio M. Garza, Circuit Judges.

PER CURIAM:

Pursuant to the Supreme Court's decisions in Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215 (1999), and Apprendi v. New Jersey, --- U.S. ---, 120 S.Ct. 2348 (2000), a fact that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in the indictment and proved to the jury beyond a reasonable doubt. Guided by these two Supreme Court decisions, it is the law of this circuit that when drug quantity is used to obtain an enhanced sentence, the quantity of drugs is an element of the offense. See United States v. Doggett, 230 F.3d 160, 164-65 (5th Cir. 2000); United States v. Meshack, 225 F.3d 556, 575 (5th Cir. 2000).

In the instant case, the quantity of cocaine base possessed with intent to distribute by Bobby Joe Burton, Jr. was neither charged in the indictment nor proven to the jury beyond a reasonable

doubt.  The life sentence given to Burton exceeds the maximum statutory penalty set forth in  21

U.S.C. § 841(b)(1), absent a showing of drug quantity or other sentence enhancing factors.  See

Meshack, 225 F.3d at 576.  We therefore vacate Burton's sentence and remand to the United States

District Court for the Southern District of Texas for resentencing.


SENTENCE VACATED AND REMANDED.

Attachment:

# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

---

No. 98-20294

---

## UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

## JOE NATHAN CRAWFORD; FRED LANDERS HERNDON, JR; MARVIN GIBBS, JR; TERALD EUGENE THOMAS; MARCUS DEWAYNE MCGEE; ALTON JEROME LEWIS; AND BOBBY JOE BURTON, JR.

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas
(H-97-CR-36-9)

---

March 8, 2000

Before REYNALDO G. GARZA,  JONES and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

### I.    PROCEDURAL AND FACTUAL BACKGROUND

Lewis, Crawford, McGee, Thomas, Gibbs, Herndon and Burton were charged, along with

24 others, by indictment in the Southern District of Texas with conspiracy to manufacture, to

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

possess with intent to distribute, and to distribute crack cocaine. Additionally, all but Lewis were charged with possession with intent to distribute. Many of the possession with intent to distribute charges were dismissed on the motion of the Government. All except Crawford were convicted of the conspiracy count. All but Lewis were convicted of at least one count of possession with intent to distribute. In addition to fines and terms of supervised release, each Appellant received a sentence for the following months of confinement: Lewis (410 months), Burton (life imprisonment), Herndon (240 months), McGee (121 months), Thomas (122 months), Gibbs (120 months), and Crawford (100 months). On appeal, each of the named appellants challenges his conviction and sentence on various grounds.

In approximately September of 1995, the FBI learned about a crack cocaine trafficking organization, the investigation of which lead to the arrest of the Appellants in March of 1997. Several techniques were used to investigate the organization, including undercover purchases of crack cocaine, camera surveillance, wiretapping, and a paid confidential informant named Calvin Workman. The execution of search warrants at Burton's and Lewis' premises revealed large sums of cash, digital scales and invoices. However, the critical evidence of the drug conspiracy arose from the undercover drug transactions and the testimony of conspiracy participants who testified against their co-conspirators. According to this evidence, the focal point of the organization was the trio of Burton, Lewis, and Christopher Cooks.[1] Cooks and Burton traveled from Bryan, Texas to Houston to purchase crack cocaine from Lewis. Cooks made 100 such trips and was accompanied by Burton on 10-20 of them. At times, Lewis would give them the

---

[1] Cooks pled guilty to various drug charges arising from the conspiracy at issue in this case.

crack cocaine in batteries that they put in their car.  Other times, the crack would be hidden inside secret compartments in vehicles provided by Lewis.  The crack cocaine was then taken back to the Bryan area for distribution.

Further testimony by conspiracy participants revealed the involvements of the other named Appellants.  Lorenzo Shirley testified about making several trips with Cooks from Bryan to Houston to purchase cocaine from Lewis.  According to Shirley, he sold cocaine to Crawford, who in turn sold the cocaine to others.  A man named Timothy Perry testified that Burton "fronted" him crack cocaine to sell so he could pay Burton $600.  Perry's customers included Herndon and Gibbs.  Reginald Caldwell, a crack addict employed by Burton and Lewis for cocaine related errands, stated that he bought cocaine from Herndon and McGee on several occasions.  A man named Glover fronted Gibbs cocaine on at least one occasion.  Workman, the confidential informant, bought cocaine from Burton, McGee, Crawford, Herndon, and Gibbs.  Finally, the testimony of co-conspirators revealed that Thomas had been involved in several crack cocaine transactions involving members of the conspiracy.

## II. DISCUSSION

## 1. LEWIS

Alton Jerome Lewis was convicted of conspiracy to manufacture, possess with intent to distribute, and to distribute cocaine. The Government alleges that he, along with Burton and Cooks, was one of the key figures in the conspiracy. Specifically, it is alleged that Lewis was the Houston supplier of the crack cocaine for the distribution ring in Bryan-College Station, Texas. Now Lewis challenges his conviction on appeal.

### a. *Brady* violation.

First, Lewis contends that the district court abused its discretion in denying Lewis' motion for new trial on the ground the government allegedly withheld exculpatory evidence and presented perjured testimony at trial. Specifically, Lewis contends that the Government's failure to turn over the lease agreement for a Rolls Royce constituted a *Brady* violation. He also contends the government suborned perjury when it argued and presented evidence that he owned a Rolls Royce when, in fact, the government was in possession of evidence that the vehicle was leased by his sister.

To establish such a claim under *Brady v. Maryland,* 373 U.S. 83 (1963), Lewis must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to Lewis, and (3) the evidence was material. *See Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996). Suppression of material, favorable evidence results in a Constitutional error if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

**6**

different. *Kyles v. Whitley*, 115 S.Ct. 1555, 1558 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Lewis argues that because he was never found to be in possession of any crack cocaine, the notion of "unexplained wealth," particularly his alleged ownership of a 1989 Rolls Royce, was a crucial element of the case against him. According to Lewis, the prosecution repeatedly elicited testimony to show that Lewis owned a 1989 Rolls Royce even though the prosecution possessed undisclosed documents which showed the car was leased by Lewis' sister and never owned by Lewis. Lewis further contends that although such documents were requested prior to trial, they were not turned over until the hearing on the motion for new trial. According to Lewis, the lease documents are exculpatory, material and favorable as they would have countered the allegation of "unexplained wealth" by showing his sister leased the car for the less-than-stunning sum of $600 a month and would have prevented the prosecutor from impeaching another defense witness (the alleged co-lessor of the car) with her failure to produce the lease documents. Thus, Lewis contends the prosecutor failed to comply with his duty to disclose such exculpatory evidence and that this non-disclosure prejudiced his defense. The district court, however, denied the motion for a new trial, finding in relevant part that Lewis knew of the alleged documents prior to or during trial.

After reviewing the parties' briefs and the record, we find that there was no *Brady* violation. As Agent Johnson explained at the hearing on the motion for new trial, it was not until the second day of the trial, when Lewis' counsel first requested copies of the lease documents, that the agents learned they had been erroneous in their belief that the leasing documents had been

**7**

turned over to the defense. At that time, Johnson made sure that a copy of a "302" was shown to Lewis' counsel. The 302 was an FBI report indicating that the Rolls Royce had been rented by a woman named Andrea Celestine. Apparently, Lewis' counsel decided not to keep a copy of the document. Johnson further testified that he told Lewis' counsel where a copy of the lease would be, if the Government had it, and who to call to acquire it. Based on the information known to Lewis, he should have been aware of the lease documents and could have easily acquired them. *See, e.g., United States v. Dixon,* 132 F.2d 192, 199 (5th Cir. 1997) ("*Brady* does not obligate the government to produce for [a defendant] evidence or information already known to him, or that he could have obtained from other sources by exercising diligence.") Thus, since there is no *Brady* violation, the district court did not abuse its discretion in denying a new trial.

Next, Lewis argues he was denied due process when the prosecution introduced testimony to the effect that Lewis owned the Rolls Royce. Lewis argues that the prosecution knew or should have known such testimony was perjured because the government had discovered the afore-mentioned documents showing the car was leased in the name of someone other than Lewis. However, Lewis fails to prove the prosecutor knew or believed that the testimony was false, thus this claim fails. *See Westley v Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (holding that appellant must show that (1) the testimony was false, (2) the testimony was material to the verdict, and (3) the prosecutor knew or believed the testimony to be false). The officers' testimony that there was a lease was equivocal, and therefore the prosecutor could not tell if such testimony was clearly false. Moreover, the record contains significant testimony that Lewis owned the car. Cooks testified that Lewis told him he owned the Rolls Royce. A person named Mitchell, who apparently

**8**

had a romantic relationship with Lewis, testified that Lewis told her it was his car, that he put it under someone else's name in order to avoid forfeiture, that if the car was taken he had an arrangement with the car lot such that "they would give it back," and that he paid $50,000 cash for the car. Given this testimony, it is not clearly perjury to testify that it was Lewis' car. The lease documents may have been part of a ruse to ensure the car would eventually be returned to Lewis in case of forfeiture resulting from a drug conviction. Thus, the prosecutor did not suborn perjury and Lewis' Due Process challenge is hereby rejected.

b. Ineffective Assistance of Counsel

Next, Lewis contends that if his counsel should have subpoenaed the lease documents for the Rolls Royce, it was ineffective assistance of counsel for him not to do so. Lewis must demonstrate both that his counsel's performance was deficient and that such deficiency was so prejudicial as to deprive him of a fair trial whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689.

Lewis fails to demonstrate ineffective assistance of counsel. He argues that "If counsel knew of a document which so undermined a large part of the prosecution, it would be ineffective assistance of counsel not to obtain it ." However, the evidence against Lewis is so strong that there is no reasonable probability that production of the lease would have affected the outcome of Lewis' trial. The evidence against Lewis included the testimony of Cooks, Shirley, Perry, Caldwell, Glover, and Mitchell, all of which demonstrated that Lewis was responsible for supplying crack cocaine for distribution. Moreover, Lewis' trial counsel could have reasonably

**9**

concluded that production of the lease document would not have undermined the prosecution's case against Lewis. The afore-mentioned "302" and the lease documents were in part incriminating because they demonstrated that relatives and associates of Lewis' with modest incomes paid $600 for another months rental of the Rolls Royce. Additionally, these documents are incriminating under the Government's theory that Lewis really "owned" the car but put it in another person's name to avoid forfeiture. It is not ineffective assistance of counsel to fail to obtain and present information that could incriminate Lewis, especially where such information was arguably cumulative of Ms. McCullogh's testimony that the car was leased by her and Lewis' sister. Thus, Lewis' ineffective assistance of counsel claim is denied.

In conclusion, Lewis' conviction is affirmed. Lewis did not prove ineffective assistance of counsel and the Government did not withhold exculpatory evidence regarding the Rolls Royce.

### 2. Crawford

#### a. Denial of severance motion.

Crawford was acquitted of the conspiracy charge but convicted of a count of possession with intent to distribute as well as counts of distribution of crack cocaine. Crawford contends that the district court abused its discretion in denying Crawford's severance motion. *See United States v. Posada-Rios*, 158 F.3d 832, 862 (5th Cir. 1998) (stating that denial of a motion to sever is reviewed for abuse of discretion). According to Crawford, his defense was prejudiced by joint trial with co-defendants with a higher level of culpability. For the reasons that follow, we find that no error or prejudice resulted from denial of severance and affirm Crawford's conviction.

**10**

First, the initial joinder of Crawford was appropriate under Fed.R.Crim.P.8(b) because he was charged with the same conspiracy. The general rule is that persons indicted together should be tried together, especially in conspiracy cases. *Posada-Rios*, 158 F.3d at 863. Initial joinder is proper if co-defendants are alleged to have participated in the same act or transactions constituting the offense. There is evidence that Crawford participated in transactions constituting the charges against his co-defendants. There was testimony that co-defendant Shirley sold wholesale quantities of cocaine to Crawford about twice a week, that co-defendant Glover "fronted" rocks of cocainee to Crawford on credit, and that the confidential informant purchased cocaine from Crawford. During a search supported by a warrant, the police recovered 49 grams of cocaine from a bedroom in which Crawford was sleeping. The name of a co-defendant was found on a caller ID in that bedroom. The initial joinder of Crawford was appropriate given his involvement in drug transactions constituting the charges against his co-defendants.

Once defendants are properly joined under Rule 8(b), a district court should grant severance only if there is a serious risk that joint trial would compromise a specific right of one of the defendants or prevent the jury from making a reliable judgment about guilt. *United States v. Broussard*, 80 F.3d 1025, 137 (5th Cir. 1996). A defendant is not entitled to severance just because it would increase his chance of acquittal or because evidence is introduced that is admissible against certain defendants. *Zafiro v. United States*, 506 U.S. 534, 540 (1993); *United States v. Moser*, 123 F.3d 813, 829 (5th Cir. 1997).

Crawford argues that the court should have granted him a severance to avoid the "spillover effect" occurring when the jury heard testimony of a major drug ring while Crawford was only

**11**

involved in relatively minor drug sales of small quantities of cocaine. In particular, Crawford contends that while the evidence was clear that his co-defendants were major actors in a conspiracy to manufacture, transport, and deliver large quantities of crack between Houston and Bryan, Texas, there was no evidence that Crawford was involved with the transportation of crack between the two cities or that he was involved with the two defendants.[2]

However, even where defendants have markedly different degrees of culpability, severance is not always required if less drastic measures, such as limiting instructions will suffice to cure the prejudice. *Broussard,* at 1037. Limiting instructions will generally suffice to cure any prejudice caused by joint trials. *See United States v. McKinney*, 53 F.3d 664, 674 (5th Cir. 1995). In this case, the district court's instructions were sufficient to cure any prejudice. The district court instructed the jury that each defendant had to be considered separately. Moreover, Crawford's acquittal on the conspiracy charge supports the conclusion that the jury was able to consider the evidence against each defendant separately. *See McKinney*, 53 F.3d at 664 ("the fact that the jury acquitted some defendants on some counts supports the conclusion that the jury sorted through the evidence and considered each count separately."). Thus, no abuse of discretion is demonstrated and Crawford's conviction is affirmed.

### 3.    McGee

McGee was convicted of (a) conspiracy to possess with intent to distribute crack cocaine, (b) possession with intent to distribute crack cocaine, (c) distribution of crack cocaine, and (d)

---

[2] We note that the evidence suggests otherwise, as a co-conspirators' phone number was found on a caller ID in a bedroom in which Crawford was sleeping.

aiding and abetting in the same. McGee challenges the denial of his motion to suppress evidence, claims to deserve a new trial based on impeachment evidence that the Government allegedly withheld, and argues that the evidence supporting his conviction was insufficient as a matter of law.

a. Motion to suppress.

Just as he did prior to trial, McGee seeks suppression of evidence of crack cocaine found in his wife's purse which was searched after his car was stropped due to an alleged traffic violation. McGee challenges the evidence as a fruit of an illegal stop. He does not challenge the police officers' actions in searching the purse after the stop.[3] While reviewing a denial of a motion to suppress, this court reviews the district court's factual findings under the clearly erroneous standard, and its conclusions of law de novo. *United States v. Blocker,* 104 F.3d 720, 725 (5th Cir. 1997). The evidence is reviewed in the light most favorable to the government as the prevailing party. *United States v. Campbell*, 178 F.3d 345, 348 (5th Cir. 1999). For the reasons which follow, we find that the stop was proper and affirm the denial of the motion to suppress.

Police may stop a vehicle where they are aware of specific articulable facts, together with rational inferences from those facts, that support a reasonable suspicion of illegal activity. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citing *Terry v. Ohio*, 392 U.S. 21, 22 (1968)). A decision to stop an automobile is reasonable where the police have probable cause to believe a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). If

---

[3] Apparently, the district court determined that McGee did not have standing to challenge the search of his wife's purse and McGee's brief does not challenge this ruling.

13

there is such probable cause, the fact that the officer intended the stop as a means to investigate other violations does not render the stop invalid. *Id.*

The stop in this case is clearly supported by probable cause. The officers stopped the car because they knew McGee was driving without a valid drivers licence in an area known to be a locus of drug transactions. The officers recognized McGee's vehicle from past dealings with McGee, and from past surveillance efforts in relation to crack cocaine sales. A check on the vehicle revealed that McGee's licence was suspended and that he had outstanding warrants. The officers followed the car and recognized McGee when he exited the car after stopping at a convenience store. They followed the car to an apartment complex. At that time, the officers knew that McGee had been driving with a suspended licence and that police policy was to charge such drivers with a class C violation until the suspended licence was confirmed. McGee and his wife were taken into custody, at which time her purse was on the floorboard of the car. Before giving her the purse, Sergeant Jones checked it for weapons and contraband and found two baggies of crack cocaine. McGee and his wife were then arrested for possession of crack cocaine. The district court determined at the suppression hearing that the officers had accurate information about the suspended license and that the officers reasonably believed valid arrest warrants existed. Nothing in the record suggests that the district court's factual findings are clearly erroneous. These factual findings lead us to the legal conclusion that there was probable cause for both the stop and the arrest.[4]   Thus, the denial of the motion to suppress is affirmed.

---

[4] Despite McGee's suggestions to the contrary, the issue under *Whren* is whether there was an objective basis for the stop. It is irrelevant whether the officers' motivation was to conduct a traffic stop in the hope of finding drugs. *Whren*, 517 U.S. at 813  (foreclosing any argument that

b.  New trial

McGee contends that he is entitled to a new trial because the Government allegedly failed to disclose a promise the Government allegedly made to his wife, Stephanie McGee, to dismiss charges against her in return for her testimony against her husband.  However, we find that McGee failed in his burden of demonstrating the existence of any such exculpatory evidence that was withheld by the government, and we therefore find that the district court committed no abuse of discretion in denying McGee's motion for a new trial.

We review the denial of a new trial for an abuse of discretion.  *See United States v. Dula* 989 F.2d 772, 778 (5th Cir. 1993) (an appellate court may reverse only if it finds the decision not to grant a new trial to be a clear abuse of discretion).  To establish a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), the defendant must show (1) the evidence was suppressed by the prosecution; (2) the evidence was favorable to the defense; and (3)  the evidence was material to either guilt or punishment.  *United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996).  We review the *Brady* issue *de novo*.  *United States v. Green*, 46 F.3d 461, 464 (5th Cir. 1995).

The issue here is whether McGee met his burden of demonstrating the existence of exculpatory evidence that was allegedly withheld by the government.  In this case, McGee must demonstrate that there was a deal between Mrs. McGee and the Government granting her leniency in exchange for her testimony, or threatening her with punishment for her failure to testify.  At the hearing on the motion for a new trial, McGee tried to prove the existence of such a deal through an

---

the Constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.)  As long as the traffic stop is proper, it is irrelevant whether the officers actually issued a citation for driving with a suspended licence

**15**

out-of-court affidavit by Stephanie McGee, dated six months after the conviction of her husband, in which she stated that she was told that "if she did not testify she could be reindicted and that she or her husband would get into more trouble." Additionally, McGee's mother testified to the out-of-court statements made by Stephanie McGee. We note that at trial, Stephanie McGee and the prosecutor testified that she was never offered leniency, or threatened with additional punishment in return for her testimony or failure to testify. During the new trial hearing, the district court refused to admit both the testimony and the declaration on the grounds that they were inadmissible hearsay, i.e they were out-of-court statements inadmissible to show the truth of the matter asserted. Notably, McGee does not challenge these evidentiary rulings on appeal. Regardless, we find no abuse of discretion in these evidentiary rulings. *See United States v. Ismoila,* 100 F.3d 380, 391 (5th Cir. 1996) (holding that evidentiary rulings are reviewed for abuse of discretion). Without this inadmissible hearsay, there remains no evidence of any exculpatory evidence which the Government failed to disclose. Thus, the district court correctly concluded there was no evidence of a *Brady* violation. Accordingly, we affirm the denial of a new trial for McGee.

### b. The sufficiency of the evidence

The next issue is whether the evidence is sufficient to support the conviction of McGee on the conspiracy, possession with intent to distribute, distribution, and aiding and abetting charges. This court views "the evidence and all inferences drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Burton*, 126 F.3d 666, 669 (5th Cir. 1997). The focus is not on "whether the trier of fact made the correct guilt or innocence determination, but

rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390 (1993).

To establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must establish beyond a reasonable doubt that (1) an agreement existed to violate the narcotics laws, (2) the defendant knew of the agreement, and (3) the defendant voluntarily participated in it. *United States v. Morgan*, 117 F.3d 849, 853 (5th Cir.. 1997). The jury may infer any element of the conspiracy from circumstantial evidence. *Id.* "To prove possession of a controlled substance with intent to distribute, the government must prove beyond a reasonable doubt the defendant's possession of the illegal substance, knowledge, and intent to distribute." *United States v. Payne*, 99 F.3d 1273, 1279 (5th Cir. 1996). To establish distribution of crack cocaine, the Government must prove beyond a reasonable doubt that 1) the defendant knowingly distributed a controlled substance, 2) the substance was in fact crack cocaine, and 3) at the time of distribution, the defendant knew the substance was crack cocaine. To prove aiding and abetting, the government must prove: 1) the association with a criminal venture, 2) the defendant's participation therein, and 3) that he actively sought its successful conclusion. *United States v. Casilla*, 20 F.3d 600 (5th Cir. 1994).

The evidence against McGee is sufficient to sustain all of his convictions. First, there is considerable evidence in the form of testimony by his coconspirators linking McGee to the conspiracy. Cooks testified that he sold crack cocaine to McGee on four or five occasions. Glover testified that he saw Cooks hand McGee an ounce of cocaine. Caldwell, another coconspirator, testified that he bought cocaine from McGee between 10 and 20 times. Workman,

**17**

the confidential informant, testified that he bought cocaine from McGee on several occasions.  As

noted, McGee's wife testified that the 141 grams of crack cocaine found in her purse belonged to

McGee.  Thus, substantial evidence shows that McGee participated in several of the drug

transactions underlying the conspiracy.  *Compare United States v. Robertson*, 110 F.3d 1113 (5th

Cir. 1997) (reversing conspiracy conviction and holding that defendant may not be convicted by

evidence that merely places him at the scene of another person's criminal act.)  From the totality of

the evidence, a jury could reasonably conclude that McGee possessed cocaine, that he was a

cocaine distributor in Bryan, that he was supplied cocaine for resale by other members of the

conspiracy, that he possessed cocaine which he intended to distribute, and that he aided and

abetting others in these illegal activities.

Given the magnitude of this web of testimony implicating McGee, we reject his argument

that Workman's testimony was not sufficiently corroborated.  McGee also argues that the audio

surveillance tapes on which McGee is allegedly heard selling crack cocaine to confidential

informant Workman are basically inaudible.  However, the remaining evidence would be sufficient

to convict McGee on all counts.  Thus, when viewed in the light most favorable to the verdict, the

evidence supports a finding that McGee knowingly participated in a conspiracy to distribute crack

cocaine, that he possessed crack cocaine with intent to distribute, that he distributed crack cocaine,

and that he aided and abetted in the same.

Additionally, we reject McGee's argument that the testimony of the indicted co-defendants

was not sufficiently credible and established no more than his personal use of cocaine base and

association with drug traffickers.  A guilty verdict may be sustained even if supported only by the

**18**

uncorroborated testimony of a co-conspirator, and even if the witness is interested due to a plea bargain, unless the testimony is incredible on its face. As long as procedural safeguards are observed, including disclosure of the fee arrangement, an opportunity for cross-examination, and cautionary jury instructions, a conviction may be sustained based on the testimony of a paid government informant. *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994). The jury was well aware of Workman's fee arrangement with the Government in this case. Moreover, the district court cautioned the jury that one who testifies against a defendant for pay or for lessor punishment must be examined with greater care than the testimony of an ordinary witness.

In conclusion, McGee's conviction is supported by sufficient evidence and the district court did not err in refusing to suppress evidence garnered during the stop of McGee's car. Nor did the the Government suppress exculpatory evidence regarding his wife. Accordingly, McGee's convictions are affirmed.

### 3. Burton

#### a. The sufficiency of the evidence.

Burton was convicted of: (a) conspiracy to manufacture, possess with intent to distribute crack cocaine, and to distribute crack cocaine, and (b) distribution of crack cocaine. Burton challenges his conviction for distribution for cocaine base on the ground that the only evidence to support it was the testimony of Melvin Workman, a paid government informant who received $14,000 in exchange for his services. He argues that the testimony of the agent who arranged for the undercover purchases of crack cocaine and the tape recordings that were made were insufficient to corroborate Workman's testimony because the agent did not witness the

**19**

transactions and the tapes were inaudible. He contends that a search of his house revealed no evidence of drug trafficking. Burton concludes that "given the background of Workman, and the financial incentives given to him by the Government, no rational trier of fact could have . . . [convicted]." Regarding his conspiracy conviction, Burton concedes that co-defendants Perry, Shirley, Glover, Caldwell, and Cooks testified that he was involved in the drug conspiracy. However, he challenges their credibility on the ground that they testified in the hope of obtaining a sentence reduction and that they did not provide the information incriminating Burton until after they entered plea agreements with the government. Finally, Burton contends he brought evidence that he was involved in a legitimate business repairing cars in the garage behind his house and in a "furniture" business.

However, the evidence is clearly sufficient to affirm both convictions. Cooks testified in detail describing trips to Houston to purchase cocaine from Lewis and countered the suggestion that Burton was involved in lawful business enterprises. Shirley and Perry described buying ounces of cocaine from Burton. Perry described Burton receiving cocaine from Lewis concealed inside a car battery and delivering money to Lewis from Burton in $100 stacks. Glover testified that Burton fronted him cocaine for resale. Workman described four purchases of crack cocaine from Burton. In conclusion, it is clear that the evidence is sufficient for a rational juror to convict Burton on all counts. As to the credibility of these witnesses who testified in the hope of obtaining a sentence reduction, it is up to the jury to determine their credibility. *See Bermea*, 30 F.3d at 1552. Burton had the opportunity to impeach these witnesses at trial, and the jury nonetheless convicted Burton. Nor is there anything remarkable about indicted individuals providing testimony

only after receiving a plea argument. Accordingly, the jury could have reasonably believed these witnesses, while disbelieving testimony that Burton was a legitimate businessman. Thus, Burton's conviction is affirmed.

b. The Admission of Expert Testimony Regarding Slang Words

Burton contends that the district court abused its discretion in allowing an expert in narcotics investigations to testify as to the meaning of code or slang words in recorded conversations. *See United States v. Griffith*, 118 F.3d 318 (5th Cir. 1997) (review of allegedly improper expert witness testimony is accomplished under an abuse of discretion standard).

In fact, the district court did not abuse its discretion. In this case, Agent Ibison, an experienced narcotics agent, testified that terms such as "13-5," which were uttered on police tapes of wiretapped conversations in this case, are terms used by drug dealers to connate the amount owed (e.g. $13,500) in a drug transaction. Experienced narcotics agents may testify as to the meaning of drug trafficking related slang and jargon. *See Griffith*, 118 F.3d at 321-23 (approving of such testimony). Burton claims that the agent only testified to the meaning of ordinary language which the jury could understand without assistance. Burton points out that terms such as "13-5" are not as exotic as "pianos" or "three pairs of boots" sold by the kilogram by drug dealers. *See United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995). This argument is not persuasive. The district court reasonably concluded that an ordinary jury would not know what "13-5" meant. *See Griffith*, 118 F.3d at 321-323 (approving of expert testimony to explain that "30" meant a "$30,000 shipment of marijuana" and that a "5 price" meant "$500 a pound.") Thus, there is no abuse of discretion in admitting expert testimony regarding slang that is made up of terms, such as

"13-5," which the jury would not easily understand without assistance. This is especially so where the district court cautioned the jury to come to its own conclusion. Thus, the admission of expert testimony clarifying the meaning of such terms is affirmed.

### c. Amount of cocaine

Next, Burton contends that the district court erred in calculating that 99.21 grams was the amount of cocaine base to be included in his "relevant conduct"at sentencing. Challenges to such findings are reviewed for clear error. *United States v. Manges*, 110 F.3d 1162, 1178 (5th Cir. 1997). A district court has wide discretion in determining which evidence to consider and to credit for sentencing purposes, *United States v. Davis*, 76 F.3d 82, 84 (5th Cir. 1996), and the defendant bears the burden of demonstrating that the information the district court relied on in sentencing is materially untrue, *id.* Under the clearly erroneous standard, if the district court's account of evidence is plausible in light of record viewed in its entirety, a Court of Appeals may not reverse it even though convinced that had it been sitting as trier of fact, it would have weighed evidence differently. *Id.*

After reviewing the record, we find that the district court committed no clear error and therefore affirm Burton's sentence. The district court based its determination of the relevant amount of cocaine on 10 transactions involving undercover purchases of cocaine by Workman from Caldwell, Burton, Darren Dove, and Gaines as described in the Presentence Report. That amount was also based on a United States Probation Officer report listing the drug transactions which were linked to Burton. Based on the conduct laid out in these documents, the district court could have reasonably concluded that Burton was responsible for 99.21 grams of crack cocaine.

**22**

First, Burton argues that this finding is clearly in error since it is based on "the testimony and statements of co-defendants with an incentive to assist the Government for cash [i.e. Workman] or for a sentence reduction. Second, Burton points out that the witnesses to the transactions were convicted felons, and crack addicts [i.e. Caldwell]. Third, Burton argues that the facts of some of the alleged transactions do not include Burton or are beyond belief. As to the first two arguments, the individuals who testified were subject to cross-examination at trial and the district court was in the best position to determine the weight that should be given their statements. Burton's conclusionary allegations that felons, crack addicts, and paid informants are incredible are insufficient to justify overruling the district court.

As to the third argument, Burton specifically attacks the district court's decision to include the amount of cocaine from transactions involving Darren Dove and co-conspirator Thomas. Burton denies that he was directly involved in these transactions. The Presentence Report states that Dove routinely purchased cocaine from Burton. Moreover, Dove was seen heading in the direction of Burton's house shortly before he sold the cocaine to the confidential informant. We cannot say that it is clear error to conclude that Dove obtained the cocaine from Burton. Alternatively, the district court, when sentencing in a drug conspiracy case, can include as "relevant conduct" the "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant [i.e., Burton]. " *See* USSG § 1B1.3; *United States v. Morris*, 46 F.3d 410, 422 (5th Cir. 1995). The district court could reasonably conclude from Burton's relationship to Dove that Dove's transactions, which involved going either to Burton's home or to the vicinity of Burton's house prior to delivery, were

**23**

reasonably foreseeable acts in furtherance of the drug conspiracy and were thus includable as part of Burton's "relevant conduct."

Regarding the Thomas transaction, there was evidence that Thomas was acting as Burton's agent when he sold the crack cocaine. The record shows that Thomas and Burton were routinely involved together in drug transactions. As to the transaction at issue in sentencing Burton, Thomas arrived with the crack cocaine shortly after a phone call was placed to Burton's residence for the purpose of acquiring crack cocaine. It would not be clear error to conclude that Burton was directly involved in this transaction. Alternatively, the district court could reasonably conclude from Burton's relationship with Thomas that Thomas' transactions were reasonably foreseeable to Burton. In conclusion, the district court did not commit clear error in calculating the amount of drugs to use in sentencing Burton. Burton's sentence is therefore affirmed.

In conclusion, Burton's sentence and conviction are affirmed. Burton's convictions are supported by sufficient evidence, the district court did not err in admitting expert testimony regarding the meaning of slang words, and the district court did not commit clear error in determining the amount of cocaine to be used in sentencing Burton.

### 5. Herndon

#### a. Attorney's absence from one half an hour of a voir dire conference

Herndon was convicted of conspiracy to possess with the intent to deliver crack cocaine; of possession with intent to deliver crack cocaine; and with knowingly distributing crack cocaine. Herndon contends he was denied his Sixth Amendment right to counsel due to his attorney's absence during a portion of the voir dire examination of jurors. Neither Herndon, nor his counsel

upon her return objected in the district court to the conduct that occurred in his attorney's absence, therefore his claim is reviewed only for plain error. *United States v. Maldonado*, 42 F.3d 906, 912-13 (5th Cir. 1995). A plain error is one which substantially effects the fairness of the judicial process and which is so prejudicial as to significantly effect the substantial rights of the accused. *See, e.g. United States v. Fortenberry*, 914 F.2d 671, 673 (5th Cir. 1990). Finding no plain error, we affirm.

The record shows that 30 represented defendants, including Herndon, were present at a pretrial hearing on May 16, 1997, when the district court announced it was going to use a jury questionnaire created from submissions of the parties to aid in the jury selection process. Without objection from Herndon's counsel, the court designated Attorney Goldsmith as the point of contact for all defense counsel for comment on the proposed questionnaire. On September 19, 1997, the court announced in open court that September 24 would be the deadline for proposed questions and that the jury would respond to the questionnaire on the Friday before the trial date on the 29th. The court informed counsel that the jurors' responses to the questionnaires would be distributed to counsel at 8:30 a.m. on September 29, that counsel would be able to use the courtroom all morning to review the responses, and that at 1:00 p.m. the jury panel would be brought to the courtroom for questioning.

On September 29, the court took roll and discovered that Herndon's counsel had been present but had left to find different clothing for her client. Since so many defense counsel were present, the court proceeded and invited counsel to comment on any concerns raised by the potential jurors responses to the questionnaires. The record shows that Herndon's attorney missed

one half hour of the discussion regarding the venire panel. Attorney Flood announced that he was "speaking on behalf of all counsel for defense" when he identified numerous jurors whose responses required further inquiry. Flood informed the court of a concern expressed by Herndon's attorney that one of the potential jurors had recently been sued by Herndon's attorney. Herndon's attorney then arrived while the prosecutor was raising his concerns about the potential jurors' responses. The conference continued and the potential jurors were brought into the courtroom and jury selection took place. Neither defense counsel nor the defendant ever objected to the conference or defense counsel's absence from part of that conference.

As interpreted, the Sixth Amendment provides that a defendant is entitled to be represented by counsel at all critical stages of a criminal proceedings which are those stages at which a substantial right of a defendant may be affected. *United States v. Taylor*, 933 F.2d 307, 313 (5th Cir. 1991). *See also Gomez v. United States*, 490 U.S. 858, 873 (1989) (reaffirming that *voir dire* is a critical stage of a criminal proceeding and stating that where the indictment is for a felony, the trial commences at least from the time when the work of empaneling the jury begins.)

However, the district court did not make plain error in proceeding despite Herndon's counsel's absence. McGee's interests at that conference were represented by counsel for a co-defendant who jointly represented all defendants and who raised McGee's counsel's questions regarding certain jurors. *Cf. United States v. Phillips*, 664 F.2d 971, 1040-41 (1981) (finding no violation of right to counsel where defense counsel was temporarily absent from the trial, defendant was represented by other counsel, and where defendant, on two of three occasions, expressly consented to the temporary representation by other counsel).

**26**

Herndon characterizes the Government's argument as saying that stand-by counsel is sufficient and responds that this court has found a Sixth Amendment violation despite the presence of "stand-by" counsel. *See United States v. Taylor*, 933 F.3d 307 (5th Cir. 1991). However, *Taylor* found a Sixth Amendment violation where defendant was totally deprived of anything but standby counsel at sentencing. In this case, defendant had counsel for all but thirty minutes of the *voir dire* meeting, the thirty minute absence was caused by counsel's decision to leave the meeting, the defendant had numerous standby counsel during that thirty minutes, and had counsel who chose not to object to the meeting after returning from her absence. Under these circumstances, we cannot say that Herndon's Sixth Amendment rights were plainly violated. Thus, the district court did not commit plain error and Herndon's right-to-counsel claim is rejected.

### b. Admission of the drug ledger.

Next, Herndon contends that the district court abused its discretion in allowing the government to introduce an alleged drug ledger reflecting Herndon's first name beside a dollar amount. The name "Fred" was on the ledger followed by a notation for $1400. The ledger was recovered during the execution of a search warrant at Burton's residence in Bryan, Texas. Herndon argues that the exhibit is inadmissible because (a) it was hearsay and (b) did not meet the coconspirator exception in Fed.R.Evid.801(d)(2)(E) because the government did not prove the ledger involved a conspiracy between himself and the author of the ledger. Evidentiary rulings are reviewed for abuse of discretion. *United States v. Ismoila,* 100 F.3d 380, 391 (5th Cir. 1996). Such errors are harmless unless a substantial right of a party is affected. *Id.*

A statement is admissible under the coconspirator exception to the hearsay doctrine where the proponent establishes by a preponderance of the evidence that (1) a conspiracy existed, (2) the statement was made in the course of or furtherance of that conspiracy, and (3), the co-conspirator and defendant are members of the conspiracy. *United States v. Narviz-Guerra*, 148 F.3d 530, 536 (5th Cir. 1998).

The testimony of co-defendants Cooks' and Perry in conjunction with the fact that the ledger was found at Burton's residence is sufficient to support a finding that the ledger was prepared by co-conspirator Burton[5] in furtherance of a drug trafficking conspiracy between himself and the persons named on the ledger. Cooks, a co-conspirator, identified the ledger as a list of people who owed money from the drug sales. Cooks testified that he knew Herndon was a crack dealer in Bryan because he sold him cocaine and that he knew that Burton sold ounces of crack to Herndon on credit for $700. This testimony is consistent with the $1400 notation on the ledger for sale of two ounces. This supports the conclusion that the ledger (the coconspirator's statement) was made in furtherance of the conspiracy, that Herndon and Burton are members of the conspiracy, and that Fred Herndon was the "Fred" identified on the list. Thus, the district court did not abuse its discretion by admitted the drug ledger into evidence.

In conclusion, Herndon's right to counsel was not violated, on review for plain error, by his attorney's brief absence from the *voir dire* conference and the district court did not err in admitting the drug ledger. Thus, Herndon's conviction is affirmed.

---

[5] We also note that the identification of the author/declarant is not always necessary for admission of a drug ledger as a co-conspirator's statement. *United States v. Fierro*, 38 F.3d 761, 773 (5th Cir. 1994).

6. Thomas

a. Sentence reduction.

Thomas was convicted of conspiracy to possess with intent to distribute crack cocaine and with aiding and abetting others to possess with intent to distribute crack cocaine. Thomas was sentenced to 122 months confinement for each count, to run concurrently, followed by a four year period of supervised release. Thomas contends that the district court erred in not granting him a two level sentence reduction, under United States Sentencing Guidelines § 3B1.2, for being a "minor participant" in the offenses for which he was convicted. The issue raised is whether the district court's finding that Thomas was not entitled to a sentence reduction due to his role in the offense is sufficiently supported by the evidence. The question of participation status is a factual question reviewable under the clearly erroneous standard. *See United States v. Valencia,* 44 F.3d 269, 272 (5th Cir. 1995); *United States v. Brown*, 29 F.3d 953, 960 (5th Cir. 1994).

Section 3B1.2(b) states that "If the defendant was a minor participant in any criminal activity, decrease by two levels." Thomas bears the burden of showing, by a preponderance of the evidence, that his role in the offenses was minor. *United States v. Brown*, 54 F.3d 234, 241 (5th Cir. 1995). The Guidelines define a minor participant as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." USSG § 3B1.2, Application Note 3. "A downward adjustment under 3B1.2 is generally appropriate only where a defendant was substantially less culpable than the average participant." *Brown,* 54 F.3d at 241. Additionally, "The defendant's participation must be enough less so that he at best was peripheral

to the advancement of the illicit activity." *United States v. Tremelling,* 43 F.3d 148, 153 (5th Cir. 1995).

In this case, Thomas, who lived at co-defendant Burton's house and was his cousin, carried drugs for Burton on *several* occasions. Based on these facts showing more than peripheral involvement in criminal activity, the district court could reasonably conclude that Thomas was not a minor participant. Additionally, co-defendant Cooks testified at trial that Thomas participated in his purchase of more than an ounce of crack cocaine from Burton and a police tape recording had Thomas referring to someone as being "two ounces short." Thomas admits that "there were arguably four incidents where Thomas was alleged to have been involved with crack cocaine." Thus, there is sufficient evidence from which the district court could conclude that Thomas did not qualify for a "minor role" sentence reduction[6].

Thomas' other arguments are without merit. First, he argues that his participation must be "minor" since he was nothing more than a person who "did the favor of picking up or delivering crack for his cousin, Burton." However, Thomas cites no case law for the proposition that criminal participation must be minor where the wrongdoer does not profit monetarily. Second,

---

[6] Alternatively, we note that minor participant status need not be granted to Thomas since his sentence was only based on drug activity in which he was actually involved. *See United States v. Atanda,* 60 F.3d 196, 199 (5th Cir. 1995) (holding that when sentence is based on activity in which defendant was actually involved, Sentencing Guidelines do not require reduction in base offense level even though defendant's activity in larger conspiracy may have been minor or minimal); *United States v. Marmolejo*, 106 F.3d 1213, 1217 (5th Cir. 1997)(holding that because only the drugs defendant actually participated in transporting were attributed to him in calculating his sentence, he cannot now claim to be a minor participant in relation to his offense.)

Thomas argues that he deserves a sentence reduction because he was less culpable that his co-defendants. However, nothing in our case law compels this conclusion. Thomas admits that Fifth Circuit case law defines "minor role" in comparison to an "average participant," not in comparison to co-defendants, but notes that the Ninth Circuit requires a comparison to the conduct of the co-participants at hand. Third, Thomas notes that this Circuit has affirmed minor role reductions in cases where the defendant's conduct was more culpable than Thomas'. *See, e.g., U.S. v. Sotelo*, 97 F.3d 782 (5th Cir. 1996) (affirming minor role reduction for defendant who participated in more than 20 drug deliveries). However, the district court's discretion in this area is not channeled by some strict quantitative analysis, rather it is exercised in light of the totality of the evidence presented to the trial court. Under the facts as a whole in this case, the district court could reasonably conclude that a defendant involved in three or four drug deliveries was not merely peripheral to the advancement of illegal activity. Therefore, Thomas' sentence and conviction are affirmed.

### 7. Gibbs

Gibbs was convicted of conspiracy to possess with intent to distribute crack cocaine, distribution of crack cocaine, and aiding and abetting in the distribution of crack cocaine. Gibbs now challenges both his sentence and conviction.

#### a. Impeachment of witness by prior arrests and misdemeanor convictions

During cross-examination by defense counsel, co-defendant Shirley testified that he had been convicted of delivery of crack cocaine, assault of a police officer, and burglary of a motor vehicle. He further testified that he had violated probation, that he had plead guilty to conspiracy

and delivery of cocaine in this case, and that he hoped to received leniency in exchange for his testimony. Defense counsel was not allowed to introduce Shirley's arrest for resisting arrest, disorderly conduct, and criminal trespass. The district court determined that the probative value of this evidence was substantially outweighed by unfair prejudice. During one attempt by defense counsel to introduce his misdemeanors, Shirley testified that he had stayed out of trouble after his release from incarceration.

Gibbs concedes that impeachment through Rule 609 is limited to felonious convictions or other convictions involving dishonesty or false statement, and that the convictions he sought to impeach Shirley with do not qualify. He argues this case requires an exception so he can correct the false impression Shirley gave of leading a law abiding lifestyle since his release from prison in 1993. Gibbs argues that he was denied his right of confrontation as guaranteed by the Sixth Amendment to the United States Constitution, because he was not able to show that Shirley had misled the jury about having stayed out of trouble since his release.

However, the district court did not abuse its discretion. Trial judges retain wide discretion to impose reasonable limits on cross-examination, particularly to prevent the introduction of the kind of cumulative and marginally relevant evidence Gibbs seeks to introduce. *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993). The issue is whether the jury had sufficient information on which to appraise the credibility of the witness. *Id.* In this case, the excluded cross-examination regarding misdemeanors was only marginally relevant and it is clear that the jury was left with sufficient information on which to evaluate Shirley's credibility. Shirley had already been impeached regarding his felonious convictions and regarding how his testimony was, at least

**32**

in part, motivated by a potential sentence reduction. Indeed, given this testimony it is highly unlikely the jury labored under the delusion that Shirley was a law abiding citizen. Given the low probative value of this cross-examination, its exclusion was reasonable under Rule 403. Alternatively, given the negligible probative value of the excluded cross-examination in light of the evidence the jury had already heard about Shirley's criminal activity, it is clear that Gibbs' substantial rights were not affected. *See United States v. Hamilton*, 48 F.3d 149, 154 (5th Cir. 1995) (holding that evidentiary rulings comprise reversible error only when they affect the substantial rights of a party).

### b. Amount of cocaine

The issue is whether the record supports the district court's sentencing finding that Gibbs was accountable for 6.1 grams of cocaine under the sentencing guidelines, U.S.S.G. 2D1.1 (c)(8), which imposes a higher sentence where defendant is responsible for more than 5 grams. While the district court's interpretation of the Guidelines are reviewed *de novo,* the amount of cocaine is a factual finding reviewed for clear error. *United States v. Carreon*, 11 F.3d 1225, 1230 (5th Cir. 1994); *United States v. Lara-Velasquez*, 919 F.2d 946, 953 (5th Cir. 1990).

6.1 grams of cocaine is the purported weight, as determined by a crime lab and as presented in the Presentence Report, of the materials delivered by Gibbs to Calvin Workman, the confidential informant. According to Gibbs, this finding is clearly erroneous since the chemist conceded that due to the absence of a purity determination, he did not know whether the actual amount of the cocaine in the material delivered to Workman was more than five grams. The

chemist merely confirmed the presence of crack cocaine in the substance submitted. Additionally, Gibb's alleges that some of the 6.1 gram figure may be attributable to the weight of the packaging.

At sentencing, the district court adopted the amount found in the lab reports, despite acknowledging the chemist's testimony, because "he didn't have the lab reports in front of him, and I did"and because "the net weight [of the drug quantity] was noted in those lab reports." We find nothing in the record which shows clear error[7]. We therefore affirm Gibb's sentence.

In conclusion, Gibb's conviction and sentence are affirmed. The district court did not abuse its discretion in refusing to allow Gibb's counsel to cross-examine a witness regarding his prior misdemeanors. Nor did the district court commit clear error in determining the amount of cocaine to be used in sentencing Gibbs.

## CONCLUSION

The convictions and sentences of all seven Appellants are hereby AFFIRMED.

---

[7] Alternatively, we note that a purity analyses of drugs transacted is not always necessary before sentencing a defendant based on the amount of those drugs. *See Chapman v. United States*, 500 U.S. 453, 461 (1991); *United States v. Polacios-Molina*, 7 F.3d 49, 54 (5th Cir. 1993) (noting that sentencing should be based in the amount of the marketable drug transacted, regardless of purity).